**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

RIVERVIEW FARMS, *et al.*    )
            )
     Plaintiffs,    )
            )  No. 18-cv-1099 L
     v.      )
            )  Judge Richard A. Hertling
UNITED STATES OF AMERICA,  )
            )
     Defendant.    )
_____)

**UNITED STATES' RESPONSE IN OPPOSITION TO PLAINTIFFS' RENEWED
MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................... 1

II.   BACKGROUND ........................................................................................... 4

      A.    Factual Background ................................................................................ 4

            1.    River Structures ............................................................................ 4

            2.    Location of River Training Structures, Locks and Dams, and Dam
                  Projects Relative to Bellwether Plaintiffs' Properties ............................. 7

            3.    Flooding of the Bellwether Plaintiffs' Properties ...................................... 8

      B.    Procedural Background ........................................................................... 10

            1.    Case Summary ............................................................................. 10

            2.    The Court's August 1, 2024 Decision ..................................................... 11

III.  LEGAL STANDARD ................................................................................... 12

IV.   ARGUMENT ............................................................................................. 14

      A.    Plaintiffs did not comply with the Court's order. ........................................ 17

            1.    Plaintiffs' claims are not limited to July-only flooding. ............................ 17

            2.    Plaintiffs do not explain how a July-only increase in flooding can
                  amount to a taking on the merits under the claims they have pled. .......... 19

            3.    Plaintiffs do not explain how any particular river-training structures
                  allegedly caused flooding on any particular property ............................... 22

            4.    Plaintiffs do not present a distinct, plausible theory regarding the
                  alleged impact of Olmsted Dam. ...................................................... 24

      B.    Plaintiffs' proposed third amended complaint is untimely and would be
            dismissed under RCFC 12(b)(1). ............................................................. 27

            1.    Under *Boling* and other Federal Circuit precedent, Plaintiffs' claims
                  are untimely because the alleged takings accrued before 2012. ............... 27

            2.    Plaintiffs did not plead a July-only claim, and July flooding does not
                  constitute a different claim in any event. .......................................... 30

            3.    Even if a July-only claim could separately accrue, that claim would
                  be untimely ............................................................................... 32

      C.    Plaintiffs' proposed complaint is not well-pleaded and would be dismissed
            under RCFC 12(b)(6). ........................................................................... 36

      D.    The Court should deny Plaintiffs the opportunity to add new parcels to the
            complaint for undue delay. ................................................................... 37

V.    CONCLUSION .......................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Alder Terrace, Inc. v. United States*,
    161 F.3d 1372 (Fed. Cir. 1998) ............................................................ 13

*Andrews v. United States*,
    153 Fed. Cl. 665 (2021) ...................................................................... 14

*Angelly v. United States*,
    -- Fed. Cl. --, No. 21-1641 L, 2024 WL 4633665 (Fed. Cl. Oct. 30, 2024) .................. 2, 18, 19

*Anza Tech., Inc. v. Mushkin, Inc.*,
    934 F.3d 1359 (Fed. Cir. 2019) ............................................................ 40

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................. 14, 21, 22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................ 14

*Boling v. United States*,
    220 F.3d 1365 (Fed. Cir. 2020) .................................................. 27, 28, 29, 32

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*,
    861 F.3d 1081 (10th Cir. 2017) ............................................................ 21

*Casitas Mun. Water Dist. v. United States*,
    708 F.3d 1340 (Fed. Cir. 2013) ............................................................ 13

*Columbia Basin Orchard v. United States*,
    116 Ct. Cl. 348 (1950)...................................................................... 30

*Crowley Gov't Servs., Inc. v. United States*,
    171 Fed. Cl. 453 (2024).................................................................... 14

*Delaware State College v. Ricks*,
    449 U.S. 250 (1980)........................................................................ 33

*Dixon v. United States*,
    158 Fed. Cl. 80 (2022)................................................................. 12, 13

*Dotcom Assocs. I, LLC v. United States*,
    112 Fed. Cl. 594 (2013).................................................................... 21

*Fallini v. United States*,
    56 F.3d 1378 (Fed. Cir. 1995) ................................................ 13, 30, 33, 34, 35

*Foman v. Davis*,
    371 U.S. 178 (1962)........................................................................ 39

*Hopland Band of Pomo Indians v. United States*,
    855 F.2d 1573 (Fed. Cir. 1988) ................................................................................... 13

*In re Bill of Lading Transmission and Processing System Patent Litigation*,
    681 F.3d 1323 (Fed. Cir. 2012) ................................................................................... 21

*Irwin Cnty. v. United States*,
    170 Fed. Cl. 355 (2024) ..................................................................................... 14, 37

*Jackson-Greenly Farm, Inc. v. United States*,
    144 Fed. Cl. 610 (2019) ..................................................................................... 33, 35

*Jackson-Greenly Farm, Inc. v. United States*,
    857 F. App'x 1021 (Fed. Cir. 2021) ................................................................... 33, 35

*John R. Sand & Gravel Co. v. United States*,
    457 F.3d 1345 (Fed. Cir. 2006) ................................................................................... 13

*John R. Sand & Gravel Co. v. United States*,
    552 U.S. 130 (2008)..................................................................................................... 13

*Kellogg Brown & Root Servs. v. United States*,
    115 Fed. Cl. 46 (2014) ................................................................................................ 14

*Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*,
    464 F.3d 1339 (Fed. Cir. 2006) ............................................................................ 12, 13

*M. Maropakis Carpentry, Inc. v. United States*,
    609 F.3d 1323 (Fed. Cir. 2010) ................................................................................... 13

*Mildenberger v. United States*,
    643 F.3d 938 (Fed. Cir. 2011) .................................................................................... 13

*Riverview Farms v. United States (Riverview Farms I)*,
    No. 18-1099C, 2019 WL 6211224 (Fed. Cl. Nov. 20, 2019) ............................... 4, 5, 6, 10, 25

*Rocky Mtn. Helium, LLC v. United States*,
    841 F.3d 1320 (Fed. Cir. 2016) ........................................................................... 14, 37

*Secured Mail Solutions LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017) .................................................................................... 14

*Te-Moak Bands of W. Shoshone Indians of Nev. v. United States*,
    948 F.2d 1258 (Fed. Cir. 1991) ........................................................................... 38, 39

*United Pac. Ins. Co. v. United States*,
    464 F.3d 1325 (Fed. Cir. 2006) ................................................................................... 14

*Vargas v. McNamara*,
    608 F.2d 15 (1st Cir. 1979).......................................................................................... 39

**Statutes**

28 U.S.C. § 1491(a)(1)...................................................................................... 13

28 U.S.C. § 2501 ............................................................................................... 13

**Rules**

RCFC 8(a)(2) ...................................................................................................... 14

RCFC 9(i)............................................................................................................ 19

RCFC 12(b)(1) ............................................................................................... 13, 27

RCFC 12(b)(6) ........................................................................................... 13, 14, 36

**Other Authorities**

7 Charles Alan Wright et al., *Federal Practice & Procedure* § 1653 .......................................... 40

**TABLE OF EXHIBITS**

| Exhibit | Description |
|:---:|---|
| 1 | Table 1: Distances and Upstream/Downstream Relationships along the Ohio River and Lower Mississippi Rivers Between River Structures in the Proposed Complaint and Bellwether Properties |
| 2 | Map of Locations of Plaintiffs' Properties and River Structures |
| 3 | Map of Selected *Angelly* Properties Interspersed Among Nearby *Riverview* Properties |
| 4 | Defendant's Expert Dr. Holmes's Report (Excerpts) |
| 5 | Plaintiffs' Expert Dr. Pinter's Deposition Testimony (Excerpt) |
| 6 | Charts Summarizing Dr. Pinter's Flooding Data & Gage-Based Flooding Data for Bellwether Properties |
| 7 | Select Years of Annual Hydrographs Prepared from Undisputed Gage Data Presented in Dr. Holmes's Analysis |

## I.    INTRODUCTION

The Court should deny Plaintiffs' motion for leave to file their proposed third amended complaint. Plaintiffs' proposed amendments fail to comply with the Court's Order of August 1, 2024, and fail to set forth timely and plausible claims, thus rendering them futile. Pls.' Renewed Mot. for Leave to File Third Am. Compl., ECF No. 160 ("Mot."); Mot. Ex. 2 (Proposed Third Amended Complaint), ECF No. 160-2 ("Prop. Compl."); 8/1/24 Mem. Op. & Order, ECF No. 157 ("Order").

Earlier this year, the Court found claims pled in Plaintiffs' second amended complaint were untimely and subject to dismissal. Order 25–26. The Court nevertheless deferred final resolution of this action to provide Plaintiffs a final opportunity to attempt to plead viable claims about July-specific flooding. *Id.* at 25–26. In doing so, the Court specifically instructed Plaintiffs to, among other things, explain (1) how "a July-only increase in flooding could amount to a taking," and (2) "how particular river-training structures have caused flooding" on Plaintiffs' properties. *Id.* Plaintiffs' third attempt to plead viable claims, however, fares no better than their two prior efforts. Plaintiffs continue to fail to meet their burden to establish timely and plausible claims.

Most fundamentally, Plaintiffs still do not plead claims based on July-only flooding. *Id.* at 25. Plaintiffs' proposed third amended complaint echoes prior pleadings, alleging floods of "greater frequency, for longer durations, and at unusual times of year, *notably into July*, which is late into the planting seasons (*collectively*, 'Atypical flooding'), in a manner that deviates from historical flooding patterns." Prop. Compl. ¶ 8 (emphases added). Thus, Plaintiffs once again allege "atypical" floods spanning multiple months that *include* July, rather than being limited to July. Flooding that extends "late into the planting season" is time-barred for the very reasons Plaintiffs' second amended complaint was untimely (ECF No. 135), namely, because evidence

establishes that flooding during the planting season for Plaintiffs' crops, including "into July," was occurring more than six years before Plaintiffs filed this action.

The Court has already found such broadly pled claims to be time-barred. Furthermore, the proposed amended claims are nearly identical to claims this Court found to be untimely in a related case. *Angelly v. United States*, -- Fed. Cl. --, No. 21-1641 L, 2024 WL 4633665 (Fed. Cl. Oct. 30, 2024). The *Angelly* court dismissed claims for properties interspersed among—some adjacent to—the properties here at issue, which were based on "atypical flooding" "notably extending into the month of July." *Id.* at *2. Thus, the dismissed *Angelly* claims are virtually identical to the new claims proposed by Plaintiffs, *i.e.*, for atypical flooding "notably into July."

Plaintiffs also fail to comply with the Court's directive, to explain how "allegations of a July-only increase in flooding can amount to a taking on the merits sufficient to state a claim." Order 25. Not only, as an initial matter, do Plaintiffs decline to tailor their claims to "July-only" floods, but "July-only" claims are implausible based on Plaintiffs' theory that flooding on their properties is caused by river-training structures that raise water surface elevations, generally. Such permanent, unmoving structures sit in the river year-round with no mechanical operation. Therefore, any effect these structures have on water surface elevations occurs at all times— without regard to season or time of year. Plaintiffs do not allege any mechanism explaining how these static structures could *selectively* raise water surface elevations, and thereby cause flooding, in the month of July.

Plaintiffs also ignore this Court's directive to identify which river-training structures purportedly caused flooding on the respective properties. *Id.* Plaintiffs attempt to side-step that directive, contending that such details relate to causation and need not be specifically pled. But the Supreme Court has held that allegations in a complaint must be plausible. The Court did not

ask Plaintiffs to *prove* causation; it merely directed Plaintiffs to plead a *plausible* mechanism of causation, consistent with notice pleading. They have not.

Each bellwether property has a different location and thus a different relationship to the Corps' river-training structures. The proposed complaint does not explain the connection between any particular property and any particular river-training structure. Vague allegations about the purported effect of structures generally, without regard to how a specific structure allegedly impacts a specific property, fails to comply with this Court's order and fails to plausibly allege causation for any Plaintiff's claim, much less the bellwethers'.

Plaintiffs' new allegations relating to Olmsted Locks and Dam are likewise deficient. *Id.* at 26. Notably, Plaintiffs allege that Olmsted's operation began three years *after* they allegedly became subjectively aware of July flooding. Plaintiffs do not explain how the *subsequent* operation of Olmsted in 2018 fits into their theory that their claims accrued in 2015 based on July flooding. Plaintiffs' other allegations regarding Olmsted, such as the purported effect of its operation on water surface elevation (which occurs only at *low*, non-flooding water levels), are equally insufficient. Plaintiffs' bald assertions about Olmsted are not tied to a plausible and timely July-flooding theory. Similar deficiencies underlie Plaintiffs' vague new allegations with respect to unspecified changes in 2017 to the Corps manual used to guide operation of Kentucky and Barkley Dams during certain floods.

The Court should end Plaintiffs' fruitless search for a viable theory of liability, which has consumed incommensurate time and resources, and deny Plaintiffs' third motion to amend their complaint, both for failure to comply with the Court's Order, *id.* at 25–26, and because the

proposed amendments are futile.[1] And in any event, the Court should also deny Plaintiffs'

untimely request to add nearly 100 claims for previously unidentified parcels.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    River Structures

This case concerns the alleged cumulative effect of river-training structures in the Ohio

and Mississippi Rivers, which Plaintiffs contend has raised surface water elevations, resulted in

flooding, and effected a Fifth Amendment taking of properties upstream and downstream of

Paducah, Kentucky and Cairo, Illinois, where the Ohio River and Mississippi River meet. The

government, as well as the Court, has summarized the background several times in connection

with prior motions. *See* United States' Renewed Mot. to Dismiss, ECF No. 36 ("Renewed

Mot."); Op. & Order, ECF No. 49;[2] United States' Mot. to Dismiss Pls.' Second Am. Compl.,

ECF No. 135 ("Sec. Mot."); Order, ECF No. 157. The United States briefly summarizes here

only the most pertinent facts.[3]

Since 1824, the Corps has built training structures in the Ohio and Mississippi Rivers,

under its congressional charge to provide a safe and dependable navigable channel through these

rivers. The Corps "constructs river training structures, such as dikes and bendway weirs, to

concentrate a river's flow in desired portions of the river," and once constructed, a river training

structure is a "permanent, unmoving feature that fulfills its purpose through its mere presence in

---

[1] The United States anticipates moving to dismiss Plaintiffs' claims if a third amendment of the complaint is allowed.

[2] Available as *Riverview Farms v. United States* (*Riverview Farms I*), No. 18-1099C, 2019 WL 6211224, at *4 (Fed. Cl. Nov. 20, 2019).

[3] Pincites following the document name of the exhibit refers to the document's page numbering or Bates numbering. Pincites following the ECF citation refers to the page numbering in the ECF-stamped header.

the river channel and functions in the same manner over time." Sec. Mot. Ex. 1 (Gordon Decl.) ¶ 2, ECF No. 135-1. River training structures are "static and cannot be actively operated." *Id.* ¶ 3.

"Most of the nearly 1,600 river-training structures in the Middle Mississippi River were in place by the mid-20th century, and the Corps had constructed more than 90 percent of them by 2000." Order 5 (citing *Riverview Farms I*, at *4). The Corps "had built 82 percent of the bendway weirs by 2000." *Id.* The Corps "had built 96 percent of the river-training structures in the Lower Mississippi River by 2000." *Id.* With respect to the Ohio River, there are far fewer structures, as illustrated by Exhibit 2. Def.'s Ex. 2. At a general level, there are 11 river training structures near River Mile 920 by Smithland Locks and Dam, 13 near River Mile 965 by Olmsted, and two near River Mile 973 which is eight River Miles upstream of the confluence of the Ohio and Mississippi Rivers. *Id.*; *see also* Sec. Mot. Ex. 22, ECF No. 135-22 at 2–6 (maps); Sec. Mot. Ex. 10, app. D, ECF No. 135-10 at 100–05 (same).

The Corps has also built and operated locks and dam projects along the relevant reaches of the Ohio River for nearly 100 years, the most recent of which is Olmsted on the Lower Ohio River. Olmsted is approximately 16 miles upstream of the confluence of the Ohio and the Mississippi Rivers, located at River Mile 964–966. Def.'s Ex. 2. It was constructed to replace Locks and Dams 52 and 53, built in the late 1920s and located at River Miles 938 and 962, respectively. Renewed Mot. Ex. 13 (Lamkin Decl.) ¶ 3, ECF No. 36-13; Def.'s Ex. 2. Olmsted only operates during periods of low water elevations to ensure navigation is not halted during those periods. Olmsted works by raising wicket gates to hold a pool of water sufficient to maintain the navigational channel. But when normal or flood elevations are present in the river, sufficient to maintain a navigable pool without assistance, the wicket gates are lowered to the riverbed so that water is allowed to flow freely. Prop. Compl. Ex. F at 1, 6, ECF No. 169-2 at 93,

98; *Riverview Farms I*, at \* 6. Olmsted was constructed offsite and then put in place during low-water seasons, between 1992 to 2004. Prop. Compl. Ex. E, ECF No. 160-2 at 90; Prop. Compl. Ex. F, ECF No. 160-2 at 96; *see also Riverview Farms I*, at \*6. It was first operated in late 2018.[4] Upstream of all bellwether Plaintiffs, as well as most of the other Plaintiffs, is Smithland Locks and Dam, located at River Mile 918.5. Def.'s Ex. 2.

On two smaller rivers upstream of the Lower Ohio River are two additional dams identified in Plaintiffs' third proposed amended complaint (and previous complaints). The Kentucky Dam is 22 miles upstream on the Tennessee River, which joins the Ohio River several miles below Smithland Dam at around River Miles 932–935. Def.'s Ex. 2; Prop. Compl. Ex. J, ECF No. 160-2 at 411. Barkley Dam is 30.6 miles upstream on the Cumberland River, which joins the Ohio River just below Smithland Locks and Dam at around River Mile 921. Def.'s Ex. 2; Prop. Compl. Ex. J, ECF No. 160-2 at 411. Congress authorized the building and operation of Kentucky Dam and Barkley Dam in the 1930s through 1950s.

During certain floods, Kentucky Dam and Barkley Dam are operated in accordance with the guidance set forth in an updated version of the 2017 manual titled "Regulation of Releases from the Tennessee and Cumberland Rivers During Ohio and Mississippi River Flood Periods" (hereinafter, "T-C Water Control Manual"). Renewed Mot. Ex. 3 (Hyder Decl.) ¶ 4, ECF No. 36-3; *id.*, ECF No. 36-3, at 6 (manual); *see also* Prop. Compl. Ex. 2, ECF No. 160-2 at 396 (same manual). The 2017 T-C Water Control Manual summarizes the changes contained within it compared to the prior 1999 manual, none of which pertained to how water flow was regulated. *Id.*, ECF No. 160-2, at 414–15.

---

[4] Exhibits E and F to Plaintiffs' proposed complaint are the same documents that were attached as Exhibits 4 and 5 to Defendant's Renewed Motion to Dismiss. *Compare* Prop. Compl. Exs. E & F, ECF No. 160-2 at 90, 96, *with* Renewed Mot. Exs. 4 & 5, ECF Nos. 36-4, 36-5.

2.      **Location of River Training Structures, Locks and Dams, and Dam Projects Relative to Bellwether Plaintiffs' Properties**

There are six bellwether Plaintiffs, all of whom are "soybean and corn farmers who monitor flood conditions as part of their farming operations." Order 11; *see also id.* at 11–14. From upstream to downstream, they are John LaFont, Michael Boatwright, Riverview Farms, Coy Buchanan, Matthew Morrow, and Island Farms South, LLC. As for the structures referenced in Plaintiffs' proposed complaint, moving downstream along the Ohio River and into the Lower Mississippi River, are Smithland Locks and Dam, *see* Prop. Compl. ¶¶ 194, 200, 205, the Barkley and Kentucky Dams (which are not on the Ohio River, but many River Miles upstream on smaller rivers that join the Ohio River), *id.* ¶¶ 205, 206, 260, Locks and Dams 52 and 53, *id.* ¶ 200, Olmsted, *id.* ¶¶ 200–04, dikes around Olmsted, *id.* ¶ 202, dikes around Hickman, *id.* ¶¶ 196–98, 16 dikes downstream of Hickman built between 1992 and 2004, *id.* ¶ 198, and 29 dikes in the Lower Mississippi River built between 1992 and 1997, *id.* ¶ 199. Table 1 summarizes the relative distances, in River Miles, of the structures and Plaintiffs' properties. Ex. 1 (Table 1); *see also* Def.'s Ex. 2 (maps, which identify the River Miles used to calculate the distances indicated in Table 1). The table in Exhibit 1, like the maps in Exhibit 2, underscores that Plaintiffs' properties are not similarly situated—they span a 60-mile stretch of two rivers with widely varying distances (upstream and downstream) to the river structures Plaintiffs mention in the proposed complaint.[5] The table in Exhibit 1 shows a factually complex situation

---

[5] This is significant, for example, because Plaintiffs have described structures like dikes as having effects upstream of the dikes, Mot. 6, which removes any connection between something like Olmsted Dikes and properties downstream of it (Buchanan, Morrow, and Island Farms South). In addition, even looking at properties that are upstream of the Olmsted Dikes (LaFont, Boatwright, and Riverview Farms), Table 1 clearly shows the vast differences in distances to the properties (31–40, 24–29, and 12–16 River Miles). Plaintiffs, however, assert no factual allegations that show how the Olmsted Dikes cause flooding on all bellwether properties irrespective of their relative location to the dikes. *See* Def.'s Ex. 1 n.1.

with disparate properties and structures.

### 3.    Flooding of the Bellwether Plaintiffs' Properties

Plaintiffs' proposed complaint alleges that their properties have "historically been subject to flooding, particularly in the winter and spring months" (it does not define "spring months"), and that this flooding is desirable because it makes their land more valuable for farming and recreation. Prop. Compl. ¶ 7; *see also* Mot. Ex. 4 ("Redline"), ECF No. 160-4 at 6, 53. It is undisputed, as the Court found, that Plaintiffs' properties "have routinely flooded from January to April." Order 8. In addition, "[t]o the extent the evidence reflects any increase in flooding after installation of the river-training structures, it happened years before 2012." *Id.* at 21.

Objective evidence (in the form of river gage data compared against levels at which Plaintiffs assert their properties flood) as well as the hydraulic modeling by Plaintiffs' own expert Dr. Pinter[6] shows that flooding of the properties occurred at some point from May to July in multiple, consecutive years between 2000 to 2011, and 1993 to 1999. Def.'s Ex. 6 (summary of gage data and Dr. Pinter's data). The same objective evidence shows that the bellwether properties experienced July flooding in numerous years before 2012. *Id.*

Although the standard for whether claims have been timely asserted is an objective one, Plaintiffs' *subjective* knowledge of flooding of their properties nonetheless also establishes that Plaintiffs' claims are untimely. Plaintiffs' knowledge, as well as other jurisdictional evidence, and the Court findings, Order 11–14, established some common facts. The bellwether Plaintiffs are highly attuned to the flooding of their properties because flooding directly affects their farming. Corn is planted earlier, from April to May, sometimes early June, depending on the

---

[6] Even with Dr. Pinter's significantly flawed analysis, *see* Sec. Mot. 19–23, his modeling still confirms that Plaintiffs' claims are time-barred.

Plaintiff and property.[7] Soybeans are planted later, from May to late June, depending again on

the Plaintiff and property.[8] These summer crops are harvested around October.[9] These dates are

consistent with a U.S. Department of Agriculture ("USDA") report.[10] Bellwether Plaintiffs

testified that, because it is more difficult to plant soybeans in July, flooding in July that destroyed

earlier planted crops in the 2011 to 2015 period, particularly in 2015, is what put them on notice

of a possible claim against the government.[11] However, Plaintiffs have admitted that crops

planted in May and June have been previously disrupted by flooding or entirely abandoned due

to May or June flooding.[12] In addition, some Plaintiffs admitted that their properties previously

experienced July flooding.[13] Each Plaintiff has asserted that the United States took a "perpetual

flowage easement over the entirety of my property" and defined the "easement [to] consist[] of

recurrent inundation of my property *during the peak growing season*." Pls.' Interrog. Resps.,

ECF No. 135-23 at 6, 16, 25, 33, 42, 54 (emphasis added). Each Plaintiff's testimony indicates

---

[7] *E.g.*, LaFont Interrog. Resp., ECF No. 135-23 at 7; LaFont Dep. Tr. 208:10–17, ECF No. 135-3(a); Boatwright Dep. Tr. 50:10–24, 51:21–25, ECF No. 135-3(b); Myers Dep. Tr. 159:25–160:6, 168:2–10, ECF No. 135-3(c); Buchanan Interrog. Resp., ECF No. 135-23, at 34, 36; Morrow Dep. Tr. 43:6–44:19, 45:12–46:1, ECF No. 135-3(e); Davis Dep. Tr. 93:5–24, 95:1–11, ECF No. 135-3(f).

[8] *Id.*

[9] *Id.*

[10] USDA – Field Crops – Usual Planting and Harvesting Dates (Oct. 2010) 38–39, ECF No. 135-4 at 39–40.

[11] *E.g.*, LaFont Dep. Tr. 160:22–161:6; LaFont Interrog. Resp., ECF No. 135-23 at 6–7; Boatwright Dep. Tr. 50:9–51:7, 51:20–51:24.

[12] *E.g.*, *Some Crops Ruined by Heavy Rain*, The Paducah Sun, July 3, 1989, ECF No. 135-17 at 79 (Boatwright discussing loss of corn and soybean crops in 1989 due to flooding continuing into early July); *Playing catch-up: Rain delays have farmers caught in late-innings bind*, The Paducah Sun, June 22, 1990, ECF No. 135-17 at 82 (Boatwright discussing planting soybeans rather than corn due to flooding in 1990); *Field of Dreams*, The Paducah Sun, July 24, 1992 (Boatwright acknowledging being unable to get corn in the ground before mid- to late-May, at significant risk to the crop); *Bottomland farming is a gamble with the rivers*, The Paducah Sun, Apr. 22, 1998 (Boatwright stating loss of all corn due to June flooding).

[13] *E.g.*, Boatwright Interrog. Resp., ECF No. 135-23 at 19; Morrow Dep. Tr. 106:14–107:8.

that peak growing season includes the months of May, June, and July.[14]

In other words, Plaintiffs have conceded flooding occurring before July, such as in May and June, as a known interference with typical corn and soybean farming practices, putting them on notice of a possible claim for an invasion of rights in prior years with such flooding. In fact, Plaintiffs define the easement allegedly taken in terms of the typical growing season, which includes May, June, and July, in the context of the farming uses of these properties, and their proposed third amended complaint alleges a taking based on flooding "at unusual times of year, notably into July, which is late into the planting season."[15]

### B.    Procedural Background

#### 1.    Case Summary

On July 26, 2018, Plaintiffs filed their original complaint asserting Fifth Amendment takings based on the purported cumulative effects of the Corps' structures that had allegedly caused "atypical flooding events during 10 of the last 10 years." Order 7 (quoting Original Compl. ¶ 13, ECF No. 1). These "admissions" which "on their face, rendered [Plaintiffs'] claims untimely," *id.* at 1, were promptly dropped from the first amended complaint filed in response to the United States's first motion to dismiss.

In Plaintiffs' first amended complaint, "the precise location of nearly 70 percent of the

---

[14] *E.g.*, Myers Dep. Tr. 158:13–15, ECF No. 135-3(c); *see also* footnote 7, *supra* (discussing timing of crop planting).

[15] While Plaintiffs identified the growing season of May, June, and July during discovery as the time of the alleged "atypical" flooding (*see, e.g.*, Boatwright Dep. Tr. 67: 3–13, ECF No. 135-3(b)), they have also identified at least three different time periods in which their alleged "atypical flooding" occurred since their initial complaint: (1) the "planting season" in prior oral argument, *Riverview Farms I*, at *6 (2) fall and winter in their amended complaints (Sec. Am. Compl. ¶ 245); and (3) the peak growing season, or May, June, and July, during discovery (*see, e.g.*, Boatwright Dep. Tr. 67: 3-13, ECF No. 135-3(b)). Their proposed complaint still fails to clearly specify when their claimed takings occurred. Because Plaintiffs never limit their claims to certain months, the United States maintains that flooding at all times of year remains germane to Plaintiffs' claims and the question of jurisdiction.

plaintiffs' parcels could not be determined." *Id.* at 8. Because the "factual record was not sufficiently developed and lacked parcel-specific information," the Court deferred ruling on dismissal, *id.* at 2 (discussing ECF No. 10). Instead, the Court ordered Plaintiffs to identify all parcels in a second amended complaint (Order, ECF No. 53) and directed the parties to undertake jurisdictional discovery for all bellwether Plaintiffs.[16]

In their second amended complaint, Plaintiffs alleged "atypical flooding" from inundations that have occurred "with greater frequency, for longer durations, and at unusual times of year" in deviation from "historical flooding patterns." Order 8 (quoting ECF No. 56). However, the second amended complaint did not specify when such "atypical" flooding occurs. *Id.* Because of the lack of "any temporal specificity" in the second amended complaint, *id.* at 16, based on Plaintiffs' admissions, the Court construed "atypical" flooding to refer to flooding other than in January to April. *Id.* at 8. And the Court found, based on the evidence developed during jurisdictional discovery, that any such flooding of Plaintiffs' properties occurred "years before 2012." *Id.* at 21.

### 2.    The Court's August 1, 2024 Decision

The Court's August 1, 2024 decision found the claims in Plaintiffs' second amended complaint were untimely, but allowed Plaintiffs to seek leave to file a third amended complaint. In doing so, the Court noted that the second amended complaint alleged the taking of a flowage easement by atypical flooding. Order 1. The asserted cause was the "alleged cumulative effects" of river training structures, which purportedly "increased the water-surface elevation." *Id.* at 7,

---

[16] Despite being ordered to "file an amended complaint identifying with specificity the address or exact location of the property of each plaintiff on or before January 31, 2020," Plaintiffs now attempt, years later, to add nearly 100 parcels. Order, ECF No. 53; Mot. 14–19. For years after the Court's order and the filing of their second amended complaint, Plaintiffs did not communicate that parcels might be missing and that they failed to comply with the order.

21. Because "more than 90 percent of [river-training] structures ha[d] been in place since before 2000," the Court found Plaintiffs' general allegations that atypical flooding was attributable to the cumulative effects of the structures to be untenable, absent identification of "specific river-training structures installed in either river since 2012 [that] have had any effect on the atypical flooding." *Id.* at 22.

In addition, the Court found that Plaintiffs have acknowledged that the Corps has been installing river-training structures since the beginning of the 20th century, and that their claims that those structures have increased flooding is based on an academic theory from the 1970s that their expert, Dr. Pinter, popularized in the early 2000s. *Id.* The river structures that Plaintiffs allege caused flooding of their properties are "installed in full public view," "sit[ting] openly and conspicuously in the rivers," "affect[ing] water flow from the moment of their installation." *Id.* at 21. Plaintiffs "knew about the structures at the time of their installation." *Id.*

"Each bellwether plaintiff testified to having to modify planting practices in years outside the statute of limitations period to accommodate flood patterns." *Id.* at 25. The Court noted that "[e]ven when these shifts in planting did not ultimately prevent them from growing and harvesting a crop, the need to alter planting schedules due to unusual flooding should have put the plaintiffs on notice of a claim related to changing flood patterns; even the stabilization doctrine does not permit the plaintiffs to delay suit until the flooding that prompted changes in planting practices had its greatest impact on their bottom lines." *Id.*

## III.    LEGAL STANDARD

"Where an amended complaint will not survive a motion to dismiss, the proposed amendment is futile." *Dixon v. United States*, 158 Fed. Cl. 80, 85 (2022) (citing *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354–55 (Fed. Cir. 2006)). "Confronted with the possibility of being denied leave to amend on the ground of futility, that

party 'must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion.'" *Id.* (quoting *Kemin Foods*, 464 F.3d at 1354–55). To survive a dispositive motion under Rule 12(b)(1), Plaintiffs must show that the Court has subject-matter jurisdiction over the claims in the proposed complaint and, under Rule 12(b)(6), the complaint must state a plausible claim on which relief could be granted.

Plaintiffs bear the burden of establishing subject-matter jurisdiction, "including jurisdictional timeliness." *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). They must do so by a preponderance of the evidence. *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010). "The Tucker Act, 28 U.S.C. § 1491(a)(1), provides the Court of Federal Claims with jurisdiction over takings claims brought against the United States." *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006), *aff'd*, 552 U.S. 130 (2008). Under the applicable statute of limitations, 28 U.S.C. § 2501, a plaintiff must bring suit within six years of the accrual of their claim. *Mildenberger v. United States*, 643 F.3d 938, 945 (Fed. Cir. 2011). A Fifth Amendment takings claim accrues "when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)). Whether a plaintiff knew or should have known of their claim is an objective inquiry in which "a plaintiff does not have to possess actual knowledge of all relevant facts in order for the cause of action to accrue." *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995). Once a party challenges jurisdiction, a court may consider relevant facts in order to resolve the dispute. *Mildenberger*, 643 F.3d at 944. After completion of jurisdictional discovery, a "court may weigh evidence presented and may make findings of fact pertinent to its

jurisdiction." Order 3 (quoting *Kellogg Brown & Root Servs. v. United States*, 115 Fed. Cl. 46, 50 (2014)).

For a complaint to state a plausible claim, a plaintiff must include "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). When reviewing a Rule 12(b)(6) motion, a court "assumes all well-pled factual allegations are true" and makes "all reasonable inferences in favor of nonmovant." *Andrews v. United States*, 153 Fed. Cl. 665, 670 (2021) (cleaned up) (quoting *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006)). "'[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice' to shield a complaint from dismissal." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).[17]

## IV.    ARGUMENT

The Court has given Plaintiffs a final opportunity to attempt to amend their complaint to plead their late-raised theory about July-specific flooding. In doing so, the Court issued specific instructions about what would be necessary to meet basic pleading requirements and to state a viable claim. Order 25–26. This was not an opportunity to simply re-plead, in a fourth complaint,

---

[17] In addition, in ruling on a 12(b)(6) motion, "a court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017) (internal quotation marks omitted); *Andrews*, 153 Fed. Cl. at 670; *see also Irwin Cnty. v. United States*, 170 Fed. Cl. 355 (2024) (citing *Rocky Mtn. Helium, LLC v. United States*, 841 F.3d 1320 (Fed. Cir. 2016)) (noting the rule that exhibits or documents incorporated into the complaint by reference must be considered in ruling on a motion to dismiss). Federal Rule of Evidence 201(b) "permits this court to 'judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Crowley Gov't Servs., Inc. v. United States*, 171 Fed. Cl. 453, 468 (2024).

the same claims the Court already found untimely but with more information. Despite the Court's clear instructions, Plaintiffs have failed to comply with the Court's order. They do not (1) limit their claims to a "July-only increase in flooding," (2) explain how "allegations of a July-only increase in flooding can amount to a taking on the merits sufficient to state a claim for a taking," (3) "explain at a bellwether-specific level how particular river-training structures have caused flooding on their properties," much less for any non-bellwether properties, or (4) present "a distinct theory regarding the impact of the Olmsted Dam on atypical flooding in July" and "why that impact is the same as the impact from the other river-training structures that allegedly cause atypical July flooding." Order 25–26. Based solely on their failure to comply with the Court's Order, Plaintiffs' motion should be denied.

In addition, Plaintiffs' motion should be denied because the proposed complaint asserts jurisdictionally time-barred claims. The Court has already ruled that claims for "atypical" flooding for non-July flooding accrued before 2012. Yet, Plaintiffs' claims still include flooding in other months encompassing flooding "at unusual times of year, notably into July, which is late into the planting season (collectively, "Atypical flooding"), in a manner that deviates from historical flooding patterns." Prop. Compl. ¶ 8.

More fundamentally, once their claims had "stabilized" such that Plaintiffs knew or should have known of new recurrent flooding of their properties, which the Court found to have occurred long before 2012, Plaintiffs' takings claim *for a permanent flowage easement*, which is the property interest allegedly taken (not flooding in a particular month), had accrued. Therefore, even if Plaintiffs had pled July-only flooding, it would not have transformed untimely claims into timely ones. Plaintiffs' claims accrued before 2012 and were not filed within the six-year statute of limitations.

July flooding is not a separate type of flooding, distinct from flooding at other times of the year (such as May and June), if as Plaintiffs allege, it stems from a general rise in the river's water surface elevation. In many cases, flooding occurring in July is simply a continuation of flooding in prior months. And, functionally, July interferes with peak growing season just like flooding in May and June, which the court already found had stabilized before 2012.

Plaintiffs' proposed complaint is also futile for failing to state a plausible claim. Plaintiffs cannot simply side-step the Court's instructions about what they must plead. The river structures and the properties at issue span a distance of more than 120 river miles. Some properties are upstream of structures that Plaintiffs describe as having downstream effects, such as dams. Some properties are downstream of structures that Plaintiffs described as having upstream effects, such as dikes. Some properties are many miles away from any structure. Plaintiffs do not tie specific structures to flooding of specific properties, as the Court directed. Nor do Plaintiffs present any theory of how the diverse configurations of structures could cause the same flooding impacts along over 120 River Miles. The proposed complaint is essentially grounded on a generic conclusory allegation that river structures raise water surface elevations and therefore cause flooding. And of course, the complaint offers no plausible mechanism for how static, river-training structures could cause flooding *in July*—or at *any* particular time of the year.

Finally, Plaintiffs' proposed complaint seeks to add 93 additional properties to the suit. The parties previously briefed this issue in November 2023 when Plaintiffs sought to amend the pleadings to add parcel identification numbers that had supposedly been "inadvertently omitted" from their January 2020 second amended complaint.[18] *See* ECF No. 136. This amendment should

---

[18] The motion was denied as moot under the Court's Order granting dismissal of Plaintiffs' second amended complaint. Order 26.

not be allowed for the same reasons previously briefed, including that the substantial delay in identifying these additional properties is unjustifiable given the Court's specific order that Plaintiffs specifically identify all properties at issue more than four years ago. *See* ECF No. 149.

### A. Plaintiffs did not comply with the Court's order.

#### 1. Plaintiffs' claims are not limited to July-only flooding.

Plaintiffs' proposed complaint mentions July just three times, none which limits their claims to July-only flooding:

> 8. However, as a direct, natural, probable and foreseeable cumulative result of the Corps' increasingly aggressive manipulation of the Rivers, the Water Surface Elevations (WSEs) of the Rivers have increased, inundating Plaintiffs' property with flood waters with greater frequency, for longer durations, and **at unusual times of year, notably into July, which is late into the planting season.** [*sic*] **(collectively, "Atypical flooding")**, in a manner that deviates from historical flooding patterns. Atypical [*sic*]

> 240. Because Plaintiffs' properties have historically flooded, recognizing a change in flooding patterns can be difficult. See excerpts of bellwether deposition testimony attached as Exhibit K. However, the Bellwether Plaintiffs each confirmed that they began to see a new pattern of flooding beginning between 2008-2011, **which continued late into the growing season (July)** and did not stabilize as a pattern until sometime in 2015. Id.

> 242. Plaintiffs' expert confirmed that in the 2009-2018 decade, **July flooding on the bellwether Plaintiffs' properties was unprecedented** compared to any prior decade. See Report of Nicholas Pinter attached as Exhibit L.

Prop. Compl. ¶¶ 8, 240, 242 (emphases added). Paragraph 8, in particular, makes clear that the "atypical" flooding Plaintiffs base their claims on includes, and is not limited to, July flooding. In other words, the proposed amended claims are not meaningfully different than the claims the Court already found were untimely. This is despite the Court's clear direction that this final opportunity to amend the complaint was to allow Plaintiffs to assert "a July-only increase in flooding." Order 25.

Plaintiffs instead followed the example of the *Angelly* plaintiffs, whose neighboring properties had experienced May and June flooding for years, as well as, for many of the properties, July flooding. *Angelly*, 2024 WL 4633665, at *13; Def.'s Ex. 3 (showing that the *Angelly* properties are interspersed among the *Riverview* properties, and in some cases adjacent to them). In *Angelly*, the plaintiffs alleged:

> 9.   However, Plaintiffs' properties are now inundated with flood waters to a greater extent, duration and frequency, **notably extending into the month of July**, in a manner that deviates from historical flooding patterns (**collectively, "Atypical Flooding"**).

> [17–36.] Plaintiff . . . was deprived of the use and enjoyment of his land, listed in Exhibit A, due to **unseasonal and Atypical Flooding during the peak farming season** caused by Government action. In 2019, a new pattern of flooding became apparent, which consistently (in 2013, 2015 and 2019) **extended flooding into the month of July**, impairing his crop yields and the value of [Plaintiff's] land.

First Am. Compl. ¶¶ 9, 17–36, *Angelly v. United States*, No. 21-cv-1641-ZNS (June 15, 2023), ECF No. 32. The *Angelly* plaintiffs' counsel, who also represent Plaintiffs here, equivocated in oral argument as to whether the *Angelly* claims were limited to July flooding. *Angelly*, 2024 WL 4633665, at *3 (claims not limited to July), *8 (claims limited to July). Judge Somers said that he could not construe the plaintiffs' claims as taking place exclusively in July when the amended complaint alleged that the atypical flooding was "extending into the month of July." *Id.* at *8. He also noted that the plaintiffs had "essentially ignored the Court's command" that they amend their complaint to provide sufficient specificity, filing instead a complaint "that continues to fail to meet its obligation to put the government on notice as what constitutes 'atypical flooding.'" *Id.* The vagueness that Judge Somers found in the allegation of flooding "extending into the month of July" is the same vagueness presented by "at unusual times of year, notably into July" in Plaintiffs' proposed complaint, which impedes "notice of exactly what is being alleged" and

the determination of "whether the alleged new atypical flooding stabilized within the statute of limitations." *Id.* "For these reasons alone, the Court can dismiss Plaintiffs' case." *Id.*[19]

Plaintiffs' proposed amendment states essentially the same claims as those in their current complaint and does nothing to further "limit or define when the atypical flooding occurs." Order 8. The definition of "atypical flooding" continues to lack sufficient "temporal specificity," *id.* at 16, as "[w]ithout specific months . . . , the amended complaint fails to give the government meaningful notice of the claims." *Angelly*, 2024 WL 4633665, at *8. The Court should not allow Plaintiffs to file their proposed amendment. The Court has already found the same temporally unspecific claims untimely.

### 2. Plaintiffs do not explain how a July-only increase in flooding can amount to a taking on the merits under the claims they have pled.

Notwithstanding Plaintiffs' failure to focus their proposed amendments on flooding in July—as this Court directed them to do—Plaintiffs also fail to explain how allegations of July-only flooding could state a viable takings claim. Order 25. River-training structures are static and cannot be actively operated. During the June 27, 2024 hearing on the United States' motion to dismiss the current complaint, the Court observed that Plaintiffs' theory that static river-training structures generally raise water levels would not explain July-only flooding. Transcript of 6/27/24 Oral Arg. 102:12–104:8, ECF No. 156 ("Oral Arg.").

> So conceptually, your argument depends on the level of the river being higher 12 months of the year, doesn't it? That may then produce more flooding in July because the river is higher in July than it had been in the past, but doesn't the river also have to be higher in January, February, March, April? I mean, the river, the river training structures, your theory is it raises the level of the rivers overall. Not just in July, correct?"

---

[19] *See also id.* at *7 ("If temporality is an important aspect of a just compensation claim, as it is here, RCFC 9(i) requires clear description of those temporal aspects of the claim to give the government, and the Court for that matter, proper notice of the property interests at issue.").

*Id.* 102:20–103:3.

> If I let you amend the complaint and you come in on July and you say, well, here is what we've got on July, that doesn't make logical sense. The Mississippi isn't flowing like this and all of a sudden in July it starts flowing like this because the river training structures, they're either going to cause the rise in the levels 12 months out of the year, but you don't have evidence of that right now.

*Id.* 103:11–18. Plaintiffs' counsel admitted that these issues presented a hurdle to proving causation, and that the hurdle was "a big one." *Id.* 104:1. Counsel could not provide any logical connection between static structures and July-only flooding at argument. And neither Plaintiffs' motion to amend nor their proposed amendments provide any plausible connection.

Rather than identifying any theory of causation that plausibly ties the Corps structures to an increase in flooding specifically in July, Plaintiffs vaguely allege, with no factual support, that a river training structure reaches "a *maximum* effect *as late as* twenty years after its construction." Prop. Compl. ¶ 219 (emphases added).[20] Plaintiffs identify structures that were built within twenty years before 2012, the beginning of the statutory period. This amounts to a flawed jurisdictional argument that attempts to delay claim accrual based on purported delayed effects, but it lends no plausible support for any July-specific causation theory. Mot. 6–10 (citing Prop. Compl. Exs. B, C); *see also* Prop. Compl. ¶¶ 194–204.

Even if the "maximum" effect of the Corps structures may not be felt until "as late as" twenty years after their construction, as alleged, the proposed complaint provides no plausible

---

[20] Plaintiffs provide no source for this conclusory contention of a twenty-year delay until "maximum" effects—an article, an academic publication, Plaintiffs' own observations, or any other source. Furthermore, elsewhere in the proposed complaint, Plaintiffs seem to contradict the notion of such a long delay when they allege that "Specific Gage Analysis, a method of isolating the contribution of instream factors to flooding, has been performed for measurement stations throughout the Mississippi River. These analyses show increases in [Water Surface Elevation] *precisely where and when Structures have been built.* In other words, *when and where* Structures were built correlates *when and where* flood levels and WSEs have increased." Prop. Compl. ¶ 267 (emphases added).

support for the theory that those static, year-round structures, regardless of when they were built, caused July-specific flooding to occur during the statutory period. As this Court has observed, to the extent these structures purportedly caused flooding by raising water surface elevations, there is no logical explanation for how they would not have done so in all months, including in May and June, and Plaintiffs have certainly not provided one. This Court has already found that claims of a taking that encompass May and June flooding are time-barred. Plaintiffs make no attempt to explain how these structures could have selectively raised water-surface elevations, and thereby caused flooding, only during July.

Plaintiffs, in fact, openly admit that they ignored the question posed by the Court—how static structures could have seasonal effects—describing it as a question "posited by the [g]overnment," that need not be addressed because it "relates to *causation* not to *jurisdiction*." Mot. 13. Both assertions are incorrect. First, that question was posed by the Court, not just the government. Order 25; Oral Arg. 102:12–104:8.[21] Second, although the pleading standard for causation is liberal, the Court is "not required to accept as true . . . unwarranted factual inferences." *Dotcom Assocs. I, LLC v. United States*, 112 Fed. Cl. 594, 599 (2013) (quoting *In re Bill of Lading Transmission and Processing System Patent Litigation*, 681 F.3d 1323, 1331–32 (Fed. Cir. 2012)). Only "well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017) (cleaned up) (emphasis omitted). The Court may identify "allegations that, because they are mere conclusions, are not entitled to the assumption of truth." *Ashcroft*, 556

---

[21] Plaintiffs *do* carry the jurisdictional burden to show a material change in the flooding that is the basis for their claim (whether seasonal, July-only, or otherwise) within six years of filing their suit, which they cannot do by putting off pleading a plausible claim of flooding consistent with the evidence developed to date. Order 25.

U.S. at 664. And "determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 663–64. Plaintiffs provide no well-pleaded facts, or any theoretical mechanism whatsoever, that would allow the Court to draw the inference that static river-training structures cause flooding only in the month of July.

Plaintiffs' new allegations regarding Olmsted on the Ohio River, Kentucky Dam on the Tennessee River, and Barkley Dam on the Cumberland River equally fail to plausibly support a theory of causation for July-specific flooding. Remarkably absent is any mention of July-specific releases from these dams, or any other operational detail that connects the dams to July flooding. Mot. 9–11; *see also* Prop. Compl. ¶¶ 204–06. Plaintiffs also mention the construction of Olmsted over several years, again, without any explanation for how the construction relates to a theory of July-only flooding that they chose not to plead. Prop. Compl. ¶¶ 3, 20, 64. As explained in Section IV.A.4, below, Plaintiffs' allegations fail to connect any government action to any flooding, including July-specific flooding.

### 3. Plaintiffs do not explain how any particular river-training structures allegedly caused flooding on any particular property.

Compounding the deficiencies in Plaintiffs' (unpled) July-only claim is Plaintiffs' failure to explain at even a bellwether-specific level how particular river-training structures have caused flooding on their properties. Order 26. The Court was clear that "plaintiffs must conform the theory underlying their claims to the facts that have been developed, and they must do so not only for the bellwether plaintiffs, but for all the plaintiffs." *Id.* Plaintiffs' failure to do so was not because the information was unavailable to them—they had notice of individuals with knowledge of river-training structures, years of discovery, and mapping layers plotting the structures throughout the relevant reaches. Gordon Decl., ECF No. 36-8; Clay Decl., ECF No.

36-9; Lamkin Decl., ECF No. 36-13; *see* Def.'s Ex. 2 (maps). The structures and properties alleged in the proposed complaint cover a distance of more than 120 river miles. Some properties are upstream of the types of structures that Plaintiffs described as having downstream effects, such as dams. Some properties are downstream of the types of some structures that Plaintiffs described as having upstream or instream effects, such as dikes (*e.g.*, Buchanan properties are downstream of Olmsted Dikes). Some properties are many miles from any structure (*e.g.*, LaFont's properties are 96 to 120 River Miles from the 16 dikes built on the Lower Mississippi River between 1992 and 2004). Plaintiffs have not presented any plausible explanation of how the diverse configurations of structures vis-a-vis properties purportedly give rise to the same type of flooding on each of the properties. Plaintiffs' proposed complaint, like their earlier ones, simply makes the generic, conclusory allegation that river structures raise water surface elevations and therefore cause flooding of their properties.

Plaintiffs appear to be hiding behind vagueness, not because they did not have the information to be more specific in their complaint, but to avoid the fact that adding specificity undermines the plausibility of their claims. As just one example, after the Court noted that because 90-percent of river-training structures were in place since 2000, Plaintiffs' claims were "untenable" without any identification of structures built since 2012 or perhaps 2008, Order 22, Plaintiffs have identified only four dikes built between 2008 and 2015 (the date Plaintiffs argue July flooding stabilized). *See* Mot. 6 (identifying four dikes built in 2010); Prop. Compl. ¶¶ 194–204. Plaintiffs vaguely allege that these four dikes are located between Hickman and Cairo, which spans more than 30 River Miles. But the very structure maps they attach to their motion show these dikes are all located between River Miles 944 and 946, meaning that these dikes are 10 River Miles upstream of properties like Morrow and Island Farms South. Prop. Compl. Ex. C,

ECF No. 160-2 at 80–81; Def.'s Ex. 2. Plaintiffs cannot square this fact with their contention that the "impacts of [river-training structures] are cumulative and primarily *upstream*" of the structure, Mot. 6 (emphasis added). These same 2010 dikes are roughly 60 River Miles away from Mr. LaFont's properties, which contradicts Plaintiffs' contention that river-training structures cause water surface elevations "where . . . [they] have been built." Prop. Compl. ¶ 267. To the extent Plaintiffs are alleging—and the United States does not know because the Complaint is vague—that the dikes built in 2010 created new July flooding at each of Plaintiffs' properties, including the Morrow, Island Farms South, and LaFont properties, Plaintiffs have failed to state facts supporting plausible claims.

In the end, Plaintiffs openly disregard the Court's instruction to include allegations in their proposed complaint to "explain how specific river-training structures cause specific effects on specific properties," arguing that the question is "*purely* a causation issue" and their allegations related to causation "must be accepted as true." Mot. 7. Plaintiffs are wrong. Their vague, contradictory, and conclusory allegations about the generalized effect of the structures do not satisfy basic notice pleading and fail to state a plausible, much less timely, claim. These are pleading and jurisdictional defects, not lack of proof of causation issues.

### 4. Plaintiffs do not present a distinct, plausible theory regarding the alleged impact of Olmsted Dam.

Plaintiffs' allegations relating to the alleged impact of Olmsted on "atypical" flooding in July, fails to comply with this Court's directive that they "present a distinct theory regarding the impact of the Olmsted on atypical flooding in July and why that impact is the same as the impact from the other river-training structures that allegedly cause atypical July flooding." Order 26. As an initial matter, Plaintiffs have alleged irrelevant facts relating to Olmsted's *operation*, which began no earlier than 2018, three years after 2015, when Plaintiffs attest they became

subjectively aware of July flooding on their properties. Mot. 9, Prop. Compl. ¶ 203. Plaintiffs do not explain how the *subsequent* operation of Olmsted fits into their claim that includes (but is not limited to) July flooding, which they contend accrued in 2015. Nor do Plaintiffs identify anything about the operation of Olmsted that is July-specific.

Plaintiffs' focus on a 12-foot rise in water levels between River Miles 939 to 964.4 that they claim Olmsted creates when in operation is equally irrelevant. This allegation lacks context and ignores that, even with a 12-foot rise, the river elevation is still well below where Plaintiffs' properties begin to flood. Mot. 9 (citing Prop. Compl. Exs. H, I). Plaintiffs cite a graph in the 1985 pre-construction Feasibility Study studying potential effects of Olmsted titled "Existing and Modified July Elevation-Duration Curves River Mile 964.0." Prop. Compl. Ex. H, ECF No. 160-2 at 136.[22] The graph shows that Olmsted was expected to modify the river's water elevation during times of low flow corresponding to low water (non-flooding) elevations—consistent with the fact that Olmsted's wicket gates are only raised during low-water to improve navigation by creating pools, and are lowered during higher flow, when the river on its own can sufficiently maintain a navigable pool. Renewed Mot. Ex. 5 at 1, 6–7, ECF No. 36-5; *Riverview Farms I*, at *6 ("The Corps lowers the dam's wicket gates during periods of high water flow to facilitate navigation in the Ohio River."). In other words, Olmsted was designed and expected to raise water levels by 12 feet only when the river was at its driest and to have no effect when the water

---

[22] Along the y-axis is the water elevation of the river in feet, and along the x-axis is the percent of time that the river's level is equal to or higher than that water elevation. The solid line represents the river's water level before the construction of Olmsted, and the dotted line represents the predicted water level after the Dam is completed. Therefore, as an example, according to the graph, before Olmsted was built, 100-percent of the time the river elevation was above 283 feet, 80-percent of the time it was above 290 feet, and 20 percent of the time it was above 300 feet.

elevation was at 300 feet or above.[23] Consequently, the dam would have no effect at water elevations that are relevant to flooding of Plaintiffs' properties because Plaintiffs properties flood at river elevations above 300 feet.[24]

Exhibit I to the proposed complaint further undermines the inference Plaintiffs seek to draw. The second and third graphs of Exhibit I, which plot water elevation against time, show that the project affects only low-water elevations, which have no bearing on flooding.[25] According to the graphs, after 2018, the minimum water elevations bottom out at 300 feet, whereas before 2018 the water elevations could go almost as low as 280 feet. Prop. Compl. Ex. I, ECF Nos. 160-2 at 393–94. On the other hand, the peaks of the graph, which correspond to times in the year when the river's water surface elevation is high and there is potential for flooding, do not show any obvious change compared to before 2018. Thus, the graphs Plaintiffs have incorporated into their proposed complaint show that Olmsted has no impact when water elevations are high enough to flood Plaintiffs' properties, thereby contradicting their theory. As such, they have failed to state any plausible theory regarding Olmsted's impact on flooding, let alone any (unpled) claims that Olmsted somehow causes July-specific flooding.[26]

---

[23] Plaintiffs admit this in Exhibit I to their proposed complaint. Prop. Compl. Ex. I, ECF No. 160-2, at 394 ("The reference lines at 298 and 301 ft MSL suggest that post-project *minimum water levels* at Paducah have risen by 2-3 feet" (emphasis added)).

[24] According to Dr. Pinter's analysis, the Riverview property begins to flood at approximately 308 feet, the Boatwright property at approximately 309 feet, and LaFont property at approximately 315 feet. Def.'s Ex. 4 (Holmes Report) at US_0327614, -7616, -7620 (plotting Dr. Pinter's model data). At those elevations, the river overtops the wickets at Olmsted. Likewise, Plaintiffs' admissions about when they flood according to the gage data shows that there is no flooding until several feet above 300. Def.'s Ex. 4 (Holmes Report) at US_0327537, -7539. Because Olmsted has no effect on water elevation when the river is at or above 300 feet elevation, its operation is irrelevant to flooding on Plaintiffs' properties.

[25] The United States does not accept Plaintiff-created exhibits, such as Exhibit I, as true and accurate evidence, and reserves the right to object to their admission.

[26] Setting aside the implausibility of flooding caused by low-flow operations cited by Plaintiffs, Exhibit I shows that the operation of Olmsted upon completion of the project would only

Further undermining Plaintiffs' theory about Olmsted, Plaintiffs' own expert, Dr. Pinter, has treated the operations of Olmsted as not contributing to the flooding of Plaintiffs' properties. Dr. Pinter's model assumes that the dams on the Ohio River are left open, unoperated and, therefore, do "not significantly affect[] flow at [those] location[s]." Def.'s Ex. 5 (Pinter Dep. Tr.) 121:22–122:1.

* * *

Plaintiffs' refusal to comply with the conditions in the Court's order for their final opportunity to plead a viable claim is reason enough to deny their motion.

**B.    Plaintiffs' proposed third amended complaint is untimely and would be dismissed under RCFC 12(b)(1).**

**1.    Under *Boling* and other Federal Circuit precedent, Plaintiffs' claims are untimely because the alleged takings accrued before 2012.**

Plaintiffs' motion should also be denied because their proposed amendment is futile under RCFC 12(b)(1) for being untimely. Plaintiffs' claim for "atypical" flooding "notably into July" due to the cumulative effects of the Corps' river structures is directed to the same physical invasion of flooding caused by the same cumulative effects of the Corp's river structures alleged in their current complaint. Under binding Federal Circuit precedent, the stabilization doctrine—which the Court has already determined applies to Plaintiffs' claims—can delay accrual of a claim until the permanent nature of the invasion is evident, but continuing damages that occur after that time do not shift the accrual date or create a separate claim. *See, e.g., Boling v. United States*, 220 F.3d 1365, 1371–72 (Fed. Cir. 2020). If a permanent flowage easement was taken in this case, any claim for such an easement accrued before 2012, when the Court found the claims in Plaintiffs' current complaint stabilized. Order 2, 21.

---

changes water elevations between River Miles 965 and 940. Prop. Compl. Ex. I, ECF No. 160-2 at 392. Only one bellwether property, Riverview Farms, lies along that stretch. Def.'s Ex. 2.

Specifically, Plaintiffs still allege a "direct, natural, probable and foreseeable *cumulative result* of the Corps' increasingly aggressive manipulation of the Rivers, the Water Surface Elevations (WSEs) of the Rivers have increased, inundating Plaintiffs' property with flood waters with greater frequency, for longer durations, and at unusual times of year." Prop. Compl. ¶ 8 (emphasis added); *see also id.* ¶¶ 165–193 (discussing structures built from 1929 to 2017). The only difference between the "atypical" flooding alleged in the current complaint and Plaintiffs' new definition of "atypical" flooding is the addition of the phrase "notably into July, which is late into the planting season." *Id.* ¶ 8. To be clear, Plaintiffs do not allege claims limited to specific, isolated, later-built structures in relation to specific properties, as underscored by their refusal to comply with the Court's order to identify specific structures in relation to specific properties. *See* Section IV.A.3, *supra*. Nor do they limit their claims to July flooding—rather, their claims still allege the same cumulative effects of the same structures from the second amended complaint cause flooding during the planting season, which by Plaintiffs' own admission is not limited to July.

The Court noted that because Plaintiffs never defined when the "atypical" flooding attributed to river-training structures occurs with specificity (a problem they still have not cured), the analysis of when the takings claims stabilized was to be equally generic, but would account for Plaintiffs' admission that flooding regularly occurred from January through April. Order 21. Therefore, the Court analyzed the question of when flooding outside of January through April window, which was allegedly caused by the structures' cumulative effects, "substantially and permanently invaded [plaintiffs'] private property such that the permanent nature of the taking [was] evident and the extent of the damage [was] reasonably foreseeable." *Boling*, 220 F.3d at 1371 (noting this to be the touchstone for any stabilization analysis). The Court found the answer

to be sometime before 2012. Order 21–22.

As applied to Plaintiffs' proposed complaint, because the substantial and permanent invasion by flooding during the planting and growing season (which includes April-July) became evident—well before 2012—Plaintiffs' claims accrued before 2012 and the statute of limitations ran before they filed suit. Any doubt as to whether Plaintiffs were on notice is resolved by the evidence already in the record. Defendant's Exhibit 6 plots each day of flooding in blue for each month for the bellwether properties according to the undisputed gage data at Cairo and Paducah, as well as from Dr. Pinter's modeling, and overlaid with the growing season for corn and soybeans. Def.'s Ex. 6. As the Court can see, there has been flooding long before the statute of limitations period during the farming season that would put Plaintiffs on notice of their claims. *Id.* Plaintiffs' tweaked definition of "atypical" flooding does nothing to alter the Court's claim accrual analysis.

Plaintiffs have not pled a claim based on July-only flooding, but even if they had, it would fail as an impermissible attempt to delay the accrual of stale claims for the taking of a permanent flowage easement based on a continuation of damages. Federal Circuit precedent makes clear that such a result would allow the stabilization doctrine to swallow the statute of limitations. *Boling*, 220 F.3d at 1371 (noting that allowing a plaintiff to wait until the damage is complete would put the stabilization doctrine in "unending conflict with the statute of limitations"). A "continually compounding claim" like the one alleged by Plaintiffs, would never accrue if the stabilization doctrine allowed the assertion of July-only flooding claim (or, at some later time, a July 29th-only flooding, or first-week of August flooding, or September flooding), for which Plaintiffs might allege the same cumulative effects of river-training structures that caused May and June flooding. A plaintiff may not wait to bring suit "until any possibility of

further damages has been removed," *Columbia Basin Orchard v. United States*, 116 Ct. Cl. 348, 357 (1950), or when "consequences of the acts became most painful," *Fallini*, 56 F.3d at 1383 (emphasis omitted). In other words, the "statute of limitations is not triggered when the plaintiffs knew or should have known that the taking had turned into an *unbearable* intrusion on their land," Order 20, but based on when plaintiffs knew or should have known that the intrusion occurred. That was decades ago. *See id.* at 2.

>           **2.**     **Plaintiffs did not plead a July-only claim, and July flooding does not constitute a different claim in any event.**

Not only is it improper under Federal Circuit precedent to create a separate takings claim based on July damages (as opposed to a government action taken in July), but treating July flooding as something different in nature, and thus a different claim, from May and June flooding, does not comport with the physical reality of floods and the practical implications of May, June, and July flooding, much less the static nature of the river training structures.

Physically, many July floods are a continuation of flooding that starts in earlier months and, practically, May, June, and July flooding all interfere with Plaintiffs' typical farming practices. That July flooding can be a continuation of May and June flooding is common sense and, furthermore, indisputable based on the results of Plaintiffs' expert, Dr. Pinter. According to the observed gage data in years with more recent July flooding, July flooding is just a fraction of other flooding that occurred each year and began *before* July. Def.'s Ex. 6 (showing blue bars indicating flooding during July in numerous years prior to 2012 and often showing that floods begin before and extend into July); *see also* Def.'s Ex. 7 (showing hydrographs of uncontested gage data for years with July flooding and demonstrating that July flooding is often minor compared to other flooding in a year and begins in prior months); U.S. Reply in Support of Its Motion to Dismiss Second Am. Compl. 13–17, ECF No. 147 (outlining problems with a July-

only flooding claim). As an example, looking at the Dr. Pinter's data for the Buchanan property (Def.'s Ex. 6, at 10), July flooding in 1935, 1943, 1947, 1974, 1997, 2004, 2008, and 2011 was part of one continuous period of water elevation above the flood level that started in May (or earlier), and July flooding in 1942, 1945, 1950, 1951, 1960, 1967, 1984, 1989, 1998, 2010, 2013, 2014, and 2015 was part of one continuous period above the flood level that started in June. Def.'s Ex. 6. The evidence in the record makes clear that July flooding is not a disconnected, independent event from May and June flooding, nor have Plaintiffs shown otherwise.

Nor could July flooding constitute a different kind of easement compared to May or June flooding. The basis of the claims are static river-training structures that do not operate differently at any point of the year, much less in July. Moreover, Plaintiffs have all defined the property interest that was taken as a "perpetual flowage easement over the entirety of my property" where the "easement consists of recurrent inundation of my property *during the peak growing season*." Pls.' Interrog. Resps., ECF No. 135-23 at 6, 16, 25, 33, 42, 54 (emphasis added). Mr. Myers, a representative of Plaintiff Riverview Farms, testified that "peak growing season" is May to August. Myers Dep. Tr. 158:13–15, ECF No. 135-3(c). And all Plaintiffs testified that corn and soybean are planted in May and June and grow until September through November, when they are harvested. *See* footnotes 7–8, *supra*. July is part of peak growing season. Therefore, under Plaintiffs' own articulation of the property interest allegedly taken, May, June, and July flooding are viewed collectively.[27]

---

[27] To be clear, claims based on flooding that occurred during other parts of the year would also be time-barred after the claims stabilized, and not just those that occurred during the growing season, or May, June, and July, especially based on the allegation of the cumulative effects of structures that statically exist year-round in the river. Once the purported invasion of Plaintiffs' properties by flooding stabilized, Plaintiffs were required to bring their claims for the entire property interest allegedly taken—a permanent flowage easement for flooding caused by the cumulative effects of the Corps' river structures.

In addition, Plaintiffs' testimony also shows that May, June, and July flooding all have crop-damaging effects. Flooding in May interferes with planting corn. *See* footnote 12, *supra.* Flooding in June interferes with planting soybean. *Id.* It is too late to plant corn in July, and it is difficult to start a soybean crop in July, but flooding in July also can adversely affect growing crops. *See id.* The Court itself noted that once Plaintiffs were starting to shift their planting due to unusual flooding, "[e]ven when these shifts in planting did not ultimately prevent them from growing and harvesting a crop," such event "should have put the plaintiffs on notice of a claim related to changing flood patterns." Order 25.

There is no physical or practical basis to treat flooding in July as a distinct claim from May or June flooding, or that a claim involving July flooding, alleged to be caused by the same static structures and cumulative effects underlying May and June flooding, accrued separately at some later time. For claim accrual purposes, government-caused floods from a general rise in water surface elevations are the same no matter when in the year they may occur; each is a physical intrusion (a trespass). Moreover, given that May, June, and July constitute a continuous growing season, there is no reason that, once floods extended into May and into June, floods extending into July would not have been a "reasonably foreseeable" part of that invasion onto Plaintiffs' properties. Def.'s Ex. 6; *Boling*, 220 F.3d at 1371. Because "atypical" flooding, as claimed by Plaintiffs stabilized, long before 2012, as made evident by the flooding charts in Defendant's Exhibit 6, and confirmed by the Court's August 1 decision, Plaintiffs' proposed new claims encompassing July flooding likewise accrued before 2012.

      **3.**      **Even if a July-only claim could separately accrue, that claim would be untimely.**

Even if July flooding were an independent claim, such a claim would have accrued before 2012, for two reasons. First, Plaintiffs' focus on July flooding rather than July-related

action continues to ignore that the "proper focus, for statute of limitations purposes, 'is upon the time of the defendant's *acts*, not upon the time at which the *consequences* of the acts became most painful.'" *Fallini*, 56 F.3d at 1383 (cleaned up) (quoting *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980)). Second, notwithstanding the irrelevance of looking at July flooding rather than July actions, July flooding occurred long before 2012, based on objective evidence that is already in the record. *See, e.g.*, Def.'s Ex. 6.

As to the first point, the Court previously warned Plaintiffs that "[i]nstead of connecting the alleged taking to the Corps' installation of river-training structures that had largely been in place for 18 years at the time of the plaintiffs' first complaint, the plaintiffs connect the accrual of their claim to the rising water levels they allege the river-training structures have caused." Order 20. Yet, Plaintiffs continue to frame their accrual arguments around the timing of floods, not the timing of structures. This is a crucial problem for Plaintiffs' timeliness because the structures, as already discussed above, are static structures that sit year-round in the river without any change. Plaintiffs point to structures built almost twenty years ago, *see* Mot. 6–11; Prop. Compl. ¶¶ 194–204, but they do not "show by preponderant evidence" that those structures plausibly caused only July flooding and thus could only "bec[o]me knowable within the limitations period," Order 19–20. Those static structures, including the ones Plaintiffs emphasize were built between 1991 and 2010, would have also caused flooding at other times of the year, including May and June, if they caused July flooding, under Plaintiffs' own cumulative effects theory. Similar to *Jackson-Greenly*, Plaintiffs have "not produced any evidence to show that the [May and June] floods were *not* caused by the river-training structures they now alleged caused the [July] flooding about which they complain[]." *Id.* at 23 (quoting *Jackson-Greenly Farm, Inc. v. United States*, 144 Fed. Cl. 610, 622 (2019), *aff'd* 857 F. App'x 1021 (Fed. Cir. 2021)).

According to Plaintiffs' proposed complaint, those recent structures, and the timing of when they were built, have nothing to do with July-only flooding.

The same holds true for Plaintiffs' allegations regarding the 2017 T-C Water Control Manual that guides the operation of Kentucky and Barkley Dams during certain floods. Mot. 10–11; Prop. Compl. ¶¶ 205–206. Plaintiffs identify nothing in the procedures in this manual that ties the action of the Corps to July flooding, such as July releases from the dam, and therefore fail to "show by preponderant evidence that the atypical flooding of which they complain can plausibly be tied to the action of the Corps and commenced or became knowable within the limitations period." Order 19–20.[28] In addition, the 2017 revision to the manual involved no substantive change to operations, but rather was an update on administrative and technology changes (such as communication channels during a flood event or the underlying code used in modeling) and to provide a more complete reference of preexisting operational considerations. *See* Prop. Compl. Ex. J, ECF No. 160-2 at 414–15 (summarizing the 2017 manual modifications). Administrative changes or a consolidation of reference information, without changes to the dams' operations, would not have caused changes in the flooding of Plaintiffs' properties in the statutory period.

As to the second point, even though Plaintiffs testified that they became aware of July flooding in 2011, 2013, and 2015, the accrual standard is objective. *Fallini*, 56 F.3d at 1380 ("[A] plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."). Objective evidence of when Plaintiffs' properties flooded in July

---

[28] In jurisdictional discovery, Plaintiffs did not identify anything specific in the T-C Water Control Manual, in response to the United States' interrogatories, indicating that Plaintiffs lack anything plausible basis to allege any changes to the 2017 T-C Water Control Manual caused any flooding, let alone July flooding. Pls.' Interrog. Resps., ECF No. 135-23 at 3, 13, 23, 31, 40, 49 (responses to Interrogatory No. 1).

shows that July flooding occurred on the bellwether properties on multiple occasions long before 2012. Def.'s Ex. 6 (showing flooding during statute of limitations in bold black line for comparison to prior time periods). Furthermore, there was no "material change" in July flooding that occurred any time in the period between July 26, 2012 to July 26, 2018, much less by 2015 (the year Plaintiffs contend July flooding stabilized, *see* Mot. 15), as compared to July flooding that occurred before 2012. *See Jackson-Greenly*, 857 F. App'x at 1027 ("Landowners needed to show that there was a material change in the effect of river training structures during the statutory time period that would justify finding that their claims stabilized after [the filing date].").

Although Plaintiffs have asserted that, in their memory, the floods in 2011, 2013, and 2015 were unlike July floods experienced before then, or there had never been a pattern of July floods akin to 2011, 2013, and 2015, this is a subjective assessment that does not control the objective accrual inquiry. Data shows that July floods were not anomalous before 2012. Def.'s Ex. 6. Some of Plaintiffs' properties had flooded in July in multiple near-successive years, such as 2008, 2009, and 2011 and others—the same pattern of "rapid succession" Plaintiffs say was new after 2012. Def.'s Ex. 6, at 8, 10 (Dr. Pinter's data for Boatwright and Buchanan properties); *id.* at 2, 5 (gage data for Boatwright and Island Farms South properties). And although Plaintiffs contend that they were prompted to investigate a possible claim when damages from July 2015 were the worst suffered, the stabilization doctrine does not allow Plaintiffs to wait until the "consequences of the acts became most painful," *Fallini*, 56 F.3d at 1383; *see* Order 24 (noting that the *Boling* rule would apply to bar a claim based on the argument that "anomalous July flooding is the first time that flooding has caused major crop damage" (cleaned up) (discussing *Jackson Greenly*, 144 Fed. Cl. 610)).

* * *

Plaintiffs choose not to plead July-only flooding claims. Just like the claims in Plaintiffs' current complaint, the claims in their proposed complaint include May and June flooding. This Court has already determined that such claims are untimely. And the temporal scope of the proposed claims is virtually identical to the claims of Plaintiffs' neighbors that Judge Somers determined were untimely in *Angelly*.

### C.    Plaintiffs' proposed complaint is not well-pleaded and would be dismissed under RCFC 12(b)(6).

Plaintiffs' motion should also be denied because their proposed complaint is futile under RCFC 12(b)(6), at a minimum, for a failure to state a plausible connection both between the river-training structures and flooding of Plaintiffs' properties, generally, and between the river-training structures and flooding of Plaintiffs' properties during July, specifically.

Plaintiffs have failed to state a plausible claim for at least the continued reason that "the connection between the existence of river-training structures and any specific plaintiff is not alleged." Order 19. This is evident from Plaintiffs' failure to comply with the Court's order regarding the specificity to be provided regarding "how specific river-training structures cause specific effects on specific properties." *Id.* at 25–26; *see* Section IV.A.3, *supra*. As discussed, Plaintiffs only provide conclusory and contradictory allegations for how any structure caused flooding of their properties within the statute of limitations.

Nor do Plaintiffs provide a plausible explanation for the alleged effect of Olmsted on "atypical" flooding in July, as discussed above. *See* Section IV.A.4, *supra*. Plaintiffs do not explain the significance of dates when Olmsted was awarded, constructed, and completed. Mot. 8; Prop. Compl. ¶ 201. Plaintiffs do not explain the significance of the fact Olmsted was installed using "in the wet construction." Prop. Compl. ¶ 201 (citing Exhibit F). In-the-wet construction

means prefabricating structures and then installing those structures in the river using a cofferdam, *see* Prop. Compl. Ex. F, ECF No. 160-2 at 93, rather than the more disruptive approach of carrying out the construction process entirely in the river. Although Plaintiffs allege that the construction of Olmsted meant that massive structures were placed in the Ohio River over time, and that each had an impact in water levels and water flow, Mot. 8; Prop. Compl. ¶ 201, Exhibits H and I of the proposed complaint establish that the completed Olmsted had no effect on water levels at higher elevations where flooding on Plaintiffs' properties occurs. *See* Section IV.A.4 (discussing how Exhibit H and I show no changes to the river level above elevations of 300 feet); *see Irwin Cnty. v. United States*, 170 Fed. Cl. at 361 (citing *Rocky Mtn. Helium, LLC v. United States*, 841 F.3d 1320 (Fed. Cir. 2016)) (noting the rule that exhibits or documents incorporated into the complaint by reference must be considered in ruling on a motion to dismiss). Plaintiffs also make no plausible allegation that Kentucky and Barkley Dams had any effect on "atypical" flooding in July. *See* Section IV.B.3, *supra* (discussing how the 2017 T-C Water Control Manual made no changes to regulation of water).

As also already discussed above, Plaintiffs' failure to identify a theory for how static river structures or general dam operations cause July only flooding is another reason why Plaintiffs do not assert a plausible claim (to the extent they have limited their claims to July-only flooding). *See* Section IV.A.2, *supra*.

**D.    The Court should deny Plaintiffs the opportunity to add new parcels to the complaint for undue delay.**

Plaintiffs' proposed complaint seeks to add 93 new parcels to the case. This is almost five years after the Court ordered Plaintiffs, in 2019, to amend their complaint to "identify[] with specificity the address or exact location" of "each property at issue in the case." 12/6/19 Order, ECF No. 53. There is no justification for this delay, and the Court should deny the request to add

these parcels.

Plaintiffs provide no explanation, much less good cause, for their failure to identify 93 properties they now seek to add when the Court ordered them to do so in 2019 (by January 2020). Whether by address, description, maps, or otherwise, there is no doubt that Plaintiffs were capable of providing that information in their second amended complaint as ordered. Yet, until Plaintiffs filed a motion almost four years later (to add 82 new parcels, at the end of 2023), Plaintiffs never informed the United States or the Court that they had been unable to identify all parcels.[29] Nor did they seek additional time to comply with the Court's order. *See* Pls.' Mot. for Leave to File Third Am. Compl. ("Mot. to Add Parcels"), ECF No. 136.[30] Plaintiffs' failure to comply with the Court's order, standing alone, is enough to deny Plaintiffs' motion.

In addition, under Supreme Court and Federal Circuit law, Plaintiffs' request is far too little, too late. "Delay alone" is "sufficient grounds to deny amendment of pleadings." *Te-Moak Bands of W. Shoshone Indians of Nev. v. United States*, 948 F.2d 1258, 1262 (Fed. Cir. 1991) (noting "even without a demonstration of prejudice"). Now almost five years after Plaintiffs filed their second amended complaint in 2020, almost seven years after they filed their original complaint, and almost nine years after they contend they purportedly became aware of their claims, and after several years of intense jurisdictional discovery, Plaintiffs now seek to add 93 new parcels—11 more parcels than they sought to add one year ago. That delay is without question "significant" and, therefore the Federal Circuit "place[s] the burden on [Plaintiffs] to

---

[29] Consistent with the United States' previous position, *see* ECF No. 149 at 19, if the Court were to allow Plaintiffs to amend their Complaint substantively (which it should not do), the United States would not object to the addition of the Riverview Farms parcel (018-00-00-008) because that parcel was disclosed in interrogatory answers during jurisdictional fact discovery and was evaluated by the United States' experts.

[30] The Court denied this motion as moot when it granted the United States' motion to dismiss Plaintiffs' second amended complaint, but deferred resolution of the case. Order 26.

show a valid reason for the neglect and delay." *Id.* at 1263 (citing *Vargas v. McNamara*, 608 F.2d 15 (1st Cir. 1979)). *Te-Moak* makes this clear, in having found that the trial court "abused its discretion by allowing the [amendment] to be filed" where the plaintiffs provided no justification for the yearslong delay in amending the complaint. *Id.* at 1263 ("[W]ith the passage of time and acceptance of multiple earlier amendments, a point is reached when the party seeking to amend must justify that request by more than invocation of the concept of the rule's liberality.").

Plaintiffs have not carried their burden. *See* Mot. 18–19. There is no possibility that Plaintiffs did not know the specific locations of their properties, and there is no reason that they could not have identified those locations in their prior complaints in a myriad of ways available to them. They were certainly not limited to using parcel numbers. *See* Mot. to Add Parcels, Ex. B, ECF No. 136-2. Plaintiffs, in their present motion and proposed complaint, offer *no justification* for their yearslong delay, after having already filed three previous complaints, and despite the explicit instructions of the Court to identify all properties in their second amended complaint in 2020.

In addition, Plaintiffs' delay in identifying their properties is prejudicial to the government. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that leave to amend may be denied for undue prejudice to the opposing party). Plaintiffs' delay is prejudicial because the parties are currently disputing the fundamental, threshold issue of whether this Court even has jurisdiction. Plaintiffs have long been on notice that the government's position is that all claims are time-barred and not within this Court's jurisdiction. It is Plaintiffs who then pressed that this threshold jurisdictional issue required parcel-specific controverting by the government. The government was then entitled to, at the outset of the jurisdictional discovery period, to know the

complete list of claims as it charted out its jurisdictional arguments, not to learn of them at the end of years of intensive discovery. Not being provided the full scope of the claims while tackling jurisdictional issues is prejudicial.

Finally, Plaintiffs request to add the 93 properties should be denied because they do not relate back to the claims already pleaded. The test is "whether the general factual situation or the aggregate of operative facts underlying the original claim for relief gave notice . . . of the nature of the allegations" the United States is being called to upon to answer. *Anza Tech., Inc. v. Mushkin, Inc.*, 934 F.3d 1359, 1369–70 (Fed. Cir. 2019); *see also id.* 1368–69. In other words, do the facts underlying the alleged claims "share an aggregate of operative facts." *Id.* at 1369. "[A]ll logically related events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *Id.* (quoting 7 Charles Alan Wright et al., *Federal Practice & Procedure* § 1653). The crux of Plaintiffs' argument in avoiding dismissal of their claims in 2019 was "that the government was required to put forth parcel-specific evidence controverting the plaintiffs' allegations of flooding." 11/20/19 Op. & Order 13, ECF No. 49. Thus, Plaintiffs implicitly conceded that there is no basis to treat the 93 new parcels—spread across counties, with no obvious geographical commonality with each other or previously pleaded properties—as being the same claim based on the same operative facts. Relation-back is therefore unavailable, and Plaintiffs' late-identified claims are jurisdictionally time-barred.

## V.    CONCLUSION

For these reasons, Plaintiffs' motion to further amend should be denied.

Dated: December 18, 2024

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*s/Laura W. Duncan*
LAURA W. DUNCAN
ASHLEY M. CARTER
MARK A. PACELLA
LEEANN KIM
United States Department of Justice
Environment and Natural Resources Division
c/o USACE Galveston District Office of
Counsel
2000 Fort Point Road, Room 321
Galveston, Texas 77550
Telephone: (202) 598-1114
Email: Laura.Duncan@usdoj.gov
ATTORNEYS FOR THE UNITED STATES